The next case on our call this morning is Agenda Number 3, Case Number 104-096, People of the State of Illinois v. Allen Beaman. Ms. Daniel, are you ready to proceed?  Good morning, Your Honors, Counsel. May it please the Court. My name is Karen Daniel, and I, along with my co-counsel Jeffrey Erdangan from the Bloom Legal Clinic at Northwestern University School of Law, represent the appellant, Allen Beaman, who is appealing from the denial of his petition for post-conviction relief. Your Honors, I know you're familiar with the record in this case. I'm not going to launch into a detailed recitation of all the facts of this case. But what I would like to say at the outset is, based on a review of the evidence in this case, the trial evidence and the post-conviction evidence, it's plain as day that Allen Beaman is an innocent man, that he did not commit the murder that's the case, that in fact he was in Rockford at the time of the crime and all that week doing the activities that he normally did at that time in his life. I'm not here to argue the sufficiency of the evidence, of course, but I do note that the legal principles that are the subject of this case and the legal rules that have been announced by the Supreme Court in Strickland and Brady and Napiew are all designed to guard against conviction of the And in addition, when a case such as this involves... Let me just stop you there for a minute, Ms. Daniel. And there was a direct appeal in which sufficiency of the evidence was at issue, is that correct? It was, Your Honor. So basically all I'm getting at is, you're asking us to reverse and remand ultimately, right, for a new trial. That's true, Your Honor. However, the direct appeal, of course, only took into account the trial evidence and not the new evidence that was offered at the post-conviction hearing. But yes, we're not here asking for an outright reversal. It is critical, though, to look at this case in the context of the weakness of the State's case and the strong evidence of innocence because in a case such as that, any trial error and any deficiencies of counsel are much more likely to undermine confidence in the jury's verdict. Alan Beeman was convicted of this murder because his trial attorney failed to do what any reasonable attorney would have done under the circumstances to bring forward critical evidence regarding the timelines of Alan Beeman and his mother, Carol Beeman. And those timelines, in turn, could have demonstrated not just a reasonable doubt of guilt, but his actual innocence before the jury. And there are at least five instances of deficient performance that I'd like to discuss this morning. But before I go there, I just want to mention, in case I run out of time this morning, that there are additional reasons that Alan Beeman was convicted in this case, one of which was that the trial prosecutor allowed his witness to mislead the jury on a critical question of fact. And in addition, the jury was deprived of the opportunity to hear about another suspect in the case, a suspect who did not have an alibi for the time of the murder and whom an experienced detective of the normal police department to this day feels is still a viable suspect. And I didn't want to not mention those issues, as I said, in case I run out of time. The ineffective assistance of counsel points all revolve around the timeline aspect of the case, which could have been dispositive of the case had the defense persuaded the jury that Alan Beeman and not his mother, Carol Beeman, had made two phone calls from the Beeman home on the morning of the murder. The calls were placed at 1037 and 1039 and nobody can seriously contend that if Alan Beeman made those calls, he could not have been in normal at noon and committed the murder. The only other person... Ms. Daniel? Yes. On that issue, I believe the youth pastor's name was Olson, is that correct? Correct, Your Honor. And Olson did testify that he can't recall ever talking to the mother. Is that true? He testified that he did not recall speaking to anybody from the Beeman household that morning. He testified that he spoke to the mother in the afternoon, and that was the 3 o'clock phone call from Olson to the Beeman house. In the morning, there were actually three phone calls in the morning. There was a phone call from the church to the Beeman home at 1022. And from all the evidence at trial, it's clear that that was Mitch Olson calling the Beeman home to remind Alan Beeman about a rehearsal they had that evening. And then at 1037, there was a call from the Beeman home to the church, which is where Alan Beeman worked. And after that, at 1039, there was another call from the Beeman home to Mitch Olson's home. So clearly, whoever was, somebody was trying to return nobody remembers talking to anybody that morning. And then they tried him at home. So there was not any testimony from Mitch Olson that he recalls speaking with the defendant in this case, or speaking with the mother, except for that one indication? That's correct. And it's everybody's assumption that Mitch Olson didn't reach anybody at 1022. He left a message. And somebody from the Beeman home, we contend, of course, it was Alan, tried to get him back. He wasn't at the church. And that's why the follow-up phone call to the Beeman, I mean, excuse me, to the Olson home would have been made. That was a one-minute call. So clearly, there was no conversation then. And further, Mitch Olson testified that that then was the reason he would have called again in the afternoon to make sure that this rehearsal was going to happen. As he describes it, he's very dogged about arranging for rehearsals with his guest performers. Ms. Dana, you mentioned that a message was left. Was there an answering machine? The Beeman home had an answering machine. Nobody collected the messages. It's certainly likely that whoever returned the message, again, we say it was Alan, just erased the message upon returning it. But yes, the Beeman home had an answering machine. The church had a live receptionist. This was back in the days when people actually took messages on pieces of paper. And I don't think there's anything in the world where Mitch Olson had an answering machine at his home. This leads into one of the respects in which counsel's performance was clearly deficient. And that is that Mitch Olson was a witness at trial. He testified as a prosecution witness and also as a defense reputation witness. But defense counsel did not elicit from him some critical facts that would have been quite persuasive on the question of who made the calls, Alan or Carol. And again, there's no dispute it was one or the other of them, nobody else. What Mitch Olson said at the post-conviction hearing that's extremely relevant here is that he explained why he was calling Alan Beeman. And he said that when he wanted to reach Alan Beeman, he would call Alan at his parents' house, and that Alan Beeman generally did return his calls. He also said that Alan Beeman had his home phone number. As to Carol Beeman, he said he had no relationship to her other than that she was the parent of one of his students. Alan had been, you know, his student in high school. He said Carol Beeman had never, ever called him. And further, he said that it was extremely unusual for any parent of a kid in the And the only reason a parent would call him at home was if someone was in trouble. And he only remembered a couple times that that had ever happened in his employment at the church, where a parent called him at home. So this evidence would have been critical in persuading the jury that, of course, it was Alan who returned the calls. And it would have prevented the prosecutor from arguing, as he did, that, well, gee, this is the kind of call a mom would have made. The mom would have wanted to impress, well, he wasn't really a youth pastor, but would have wanted to impress Mr. Olson. That was a supposition by the prosecutor. But the actual evidence, had it been presented, would have been persuasive that, of course, Alan Beeman made these calls. Now, the State's position at trial was that Alan Beeman was not in a position to make the calls, because at 10-11 that morning, he was videotaped leaving a bank in Rockford where he had made a transaction. No, there was no dispute about that. And it was the prosecution's position that he did not have time to get home from the bank at 10-11 to make the calls at 10-37, 26 minutes later. And in support of that proposition, the prosecution offered the testimony of a normal police detective, Timothy Friesmeier, who said he had timed the drive. He timed it at the speed limit. He timed the drive to see if it was possible for Alan Beeman to make it home to make the calls. And Detective Friesmeier told the jury that the drive took 31 minutes, so that if Alan Beeman had left the bank at 10-11, he would have arrived home at 10-42. Obviously, that would have been too late to make the calls. Any – That was the direct route. Well, that was – exactly. And that's almost a separate point, but that was going the slow route right through downtown Rockford, which – now, remember, Detective Friesmeier was not from Rockford. He was from Bloomington Normal. But he said he chose that route because it was the most direct route in terms of miles. That officer never put the fastest route. Exactly. He had also – Did anyone put that in the record? Nobody put that in the record, Your Honor. That was – Detective Friesmeier, in the grand jury proceedings, told the grand jury that he had tested what he knew to be the quicker route, which was – we called the bypass route. More miles, but faster roads. He did that route in 25 minutes. Was it cross-examined on that, Ms. Daniels? Well, that's the second respect in which defense counsel's performance was absolutely deficient. It's clear that the defense had the grand jury transcript? It was in discovery. It's not clear to me that he remembered it at the time of trial, but it was offered in discovery. He had it. So he had in front of him Detective Friesmeier, the same officer who was up there saying it takes 31 minutes, he had Friesmeier having timed it bank to Beeman House in 25 minutes, and he said to the grand jury, well, then if he left at 1011, he would have gotten home at 1036, which, of course, would have then made perfect sense that the first thing he did when he got home before he went to sleep after working all night was return the phone call and then go to sleep. So counsel did not cross-examine him on that? He did not. And the only evidence other than Detective Friesmeier's 31-minute time trial that was before the jury was testimony from Alan Beeman. And he was asked, well, how long does it take you to get home from the bank? And he said, well, it takes roughly a half an hour. It's, I mean, it just seems almost too obvious to argue that, of course, a defense attorney having evidence of a timed trial by the police detective who's on the other side of the case from him would use that rather than asking his client, who's being vilified by the prosecutor throughout the trial and obviously is on trial for his liberty, well, about how long does it take? Well, it takes about a half an hour. A related deficiency in counsel's performance is that he didn't run his own time trials. Now, the times were critical in this case. And five minutes here and five minutes there could make or break a timeline for either side. So, of course, any competent attorney is going to run their own time trials and compare them to what the other side has done. And in this case, it was especially imperative that the defense do that because Detective Friesmeier in this instance did his time trials at the posted speed limit. Now, as to other time trials, such as between Rockford and Normal, he did them both at the posted speed limit and above the speed limit, because in those situations it was to the interest of the prosecution to show that Allen could have gotten there faster, as fast as possible. Was it 70 miles average? Seventy-five miles per hour average. And those were the times that were the basis for the prosecution's Allen-Beeman timeline, which, by the way, left absolutely no wiggle room. It depended on high-speed trip both ways, no stops, no bathroom breaks, no filling up gas tank. Did the same officer establish the average of 75 miles per hour? Yes, it was the same officer who did all the time trials. And the reason for the slow drive as compared to the 75-mile-an-hour drive, when getting to each place was important? Well, it was important to have a realistic view of how long it would take to get from one place to another. And I'm actually not sure why he timed all these drives at the posted speed limit. Maybe he wanted to be conservative. The purpose of driving at a faster rate of speed at the flow of traffic is to get an idea of how long it really takes someone to get from one point to another. But he didn't do that with the bank-to-Beeman drive times. Counsel, I want to come in with this question at the right time, and now that we are in normal. How do we set the time of death of the young woman in normal? At noon, I believe, is... Well, that has always been, well, I should say that was the trial prosecutor's theory and remains, as far as I understand, the theory of the state in this appeal. And the prosecution took the view that the state of the crime scene suggested that this is what they told the jury, suggested that the victim, Jennifer Lockmiller, had come in, thrown down her bags, and turned on her favorite soap opera, which started at noon, and everyone knew she liked that soap opera. And they argued that it didn't seem like anything else much had happened in the apartment other than that. That's what they argued to the jury. I think it's evident that that was in part a theory of convenience, because they needed to get out, in order for Alan Beeman to possibly be guilty of this case, they needed to get him out of the apartment by 12.15 in order for him to travel back at 75 miles per hour and get home before his mom got home at 2.15. There was evidence, though, and this was very compelling evidence that was presented by the defense, from a neighbor who lived across the hall from Jennifer Lockmiller. His name is David Singley. And this was a two, it was like four apartments in the building. It was a two-floor complex, and he lived in the second-floor apartment across the hall from Jennifer Lockmiller. And he testified at trial that he came home from his class at approximately 1.45 that afternoon, and that when he came in the door at street level, he heard Jennifer Lockmiller's door open and close. He didn't see anybody. He went upstairs to his apartment across the hall. He went inside and closed the door. He was changing to get ready to go to the pool. And he testified that while he was in there, he again heard the door open and close, and then he heard somebody go downstairs and leave the building. And that's sometime between 1.45 and 2 p.m. And so the defense argued at trial that the murderer, whenever the murderer got there, and I'll accept that the state's theory that the murderer got there at noon, but the murderer was still there at 1.45 and 2. And I think that was a very compelling theory based on the testimony of this very impressive witness. He was a Marine by the time he testified at trial, and he had given the police this information right at the beginning of their investigation. Was the defense premised on this odometer reading? Well, there's more than one premise to the defense. I mean, the overall defense was that Alan Beeman was in Rockford. And there were a couple of ways that the defense endeavored to establish this. One was that there had not been enough of a change in the odometer reading on Alan's car to account for a round trip to normal that week. The odometer had been looked at two separate times about a week apart. So that was one aspect of the defense, not enough of a change on the odometer reading. And the defense knew that the state had an expert that was going to come in and say, well, maybe the odometer was tampered with and that also the state was going to take issue with the defense calculations of how many miles Alan Beeman had driven in Rockford that week. But a different aspect of the case that the defense was trying to establish was that at the precise time of the murder, Alan Beeman was in Rockford. And that's what this timeline evidence goes to. And as I said, besides not using the drive that Detective Friesmeier had given or had testified to in the grand jury, defense attorney didn't do his own drive times. And when we did them at the flow of traffic, we got 22-minute drive times from the bank to the Beeman home using the fast route, the bypass route. We had two time trials going through downtown. But those, again, those time trials were at the flow of traffic or with the flow of traffic. And one of those came out to 26 minutes. So had the defense attorney had his investigator, who was driving around Rockford anyway, doing all these routes and checking mileage, had he just had his investigator time these routes, he could have presented the jury with evidence that clearly if Alan took the bypass route, which was the sensible route, he would have gotten home in time. But it was also possible for him to get home in time to make the calls even if he drove downtown. But he didn't do that. Ms. Daniel, I know it's not the heart of your argument, but back to that odometer for just a second. There was rebuttal testimony presented by the defendant that acknowledged tampering but said it was done by a previous owner of the car? Well, I don't remember if it was on rebuttal, but the previous owner of the car had changed the odometer or speedometer cable, maybe they're the same cable, twice because the speedometer wasn't working. And the second time they changed it was shortly before the car was sold to a dealership, who then sold the car to the Beeman's. There's also evidence, though, that the odometer had been continuing to work, that the odometer, and I don't have the numbers in front of me, but it was maybe 65,000 miles at the time the car was sold to the Beeman's. It was maybe 77,000 miles at the time this case arose. When the car was inspected later, basically when Alan Beeman was arrested, the car wasn't working at that time. And later there was an inspection, and at that time the odometer reading was 80-something thousand miles. So it was still working. That was the evidence on the odometer. The flip side of the timeline. Your time is up, but I believe Justice Freeman has a question. Thank you, Your Honor. The focus on the odometer evidence as opposed to the telephone call evidence, could that not have been a reasonable strategy choice under Strickland? Well, the United States Supreme Court case of Wiggins v. Smith I think is very helpful in that regard. And Wiggins distinguishes between a strategic choice to not pursue one line in favor of another as against presenting evidence on two lines of defense and just doing a bad job on one of them. Defense counsel was trying to show that Alan Beeman could have made the calls and did make the calls, and he was trying to show that Carol Beeman could not have and did not make the calls. He just did an incompetent job at doing that. He didn't use the evidence he had before him. He didn't do Carol Beeman drive times. He didn't develop that side of it that Carol Beeman really had too much to do between 1040 a.m. and 1110 a.m. when she checked out of Walmart in terms of driving all the way back to the Walmart and doing all the shopping that she did in a huge Walmart in several different departments. He didn't do enough to develop that part of his defense. He didn't make a strategic decision not to pursue it. He just did an incompetent job with it. Your Honor, with regard to the remaining issues, I rest on the briefs. We're asking that Alan Beeman's convictions be reversed. Thank you. Thank you, Ms. Daniel. Mr. Blankenheim. Good morning, Your Honors. Counsel, may it please the Court. My name is Michael Blankenheim. I'm an assistant attorney general appearing this morning on behalf of the people of the state of Illinois. The appellate court's judgment denying post-conviction relief should be affirmed because petitioner has failed to demonstrate substantial denial of a constitutional right during his 1995 trial for murder. I'd like to start with the issue Ms. Daniel spent the majority of her argument on, the ineffective assistance claim. In this case, at the post-conviction evidentiary hearing, defense counsel testified that his primary trial strategy was to demonstrate petitioner's lack of opportunity to commit the murder by focusing on the odometer evidence. In this case, defense counsel noted that he had independently noted documentary evidence of petitioner's mileage readings. In this case, there was a receipt from a Sears where a petitioner had taken his car to have new tires placed on the car, and that indicated one mileage reading on August 24, 1993. And then a week later, defense counsel's other piece of evidence was a photograph taken by a petitioner's mother indicating that in the intervening period, the car had only been driven 322 miles. As defense counsel noted, that was not, if the jury had accepted the mileage readings that was part of the petitioner's defense, the jury would have been able to conclude that petitioner could not have driven both to normal and back and conducted his day-to-day activities in Rockford. In this case, that was to make the odometer evidence the primary element of the defense was a reasonable strategic decision. What about Ms. Daniels' argument, though, that we're not talking about a decision to present some evidence and not present others? They did present some evidence. The counsel did present some evidence with respect to the whole timing situation and was just efficient in doing so. So how is there, you seem to focus, in fact, that's what Justice Freeman's question talked about, how the focus of the defense counsel was on the odometer, but yet there was an attempt, at least, to try to show that the timing was off as well. How do you address that? Certainly, that's correct. And this is not a case where defense counsel completely neglected other exculpatory evidence. Rather, he did argue to the jury that, based on Carol Beamon's timeline, that she was less likely than petitioner to have made the phone calls. He highlighted her shopping receipts. He argued that, based on the location between Carol Beamon's mother's retirement home and the Walmart, that it was not possible for her to go all the way back. How could he ignore the grand jury testimony of the officer, though? In this case, the defense investigator, Vern Pickett, had testified on redirect examination by defense counsel that, in his opinion, reliable comparisons couldn't be made between two independently conducted drive times. So with that information, defense counsel could reasonably view the timeline evidence as less reliable and less significant than the odometer evidence that he made the most important feature of his defense. And then, just to go into that a bit more, Your Honor, defense investigator Pickett testified that such comparisons weren't meaningful, given the number of variables that arise between two independently conducted time trials. For example, the route taken, the time of day, the weather, the speed at which the time trial is conducted. And those are the same factors that the appellate court noted in finding, in affirming the trial court's holding that defense counsel's strategy was objectively reasonable. And again, Your Honor's asked Ms. Daniel about whether defense counsel had questioned Detective Friesenmeier about the time trials. While he did not introduce the fact of Friesenmeier's 25-minute time trial of the bypass route, he did question Detective Friesenmeier regarding, in essence, why the state had selected the downtown route as the basis for demonstrating that petitioner's alibi, that he was home at the time, or that he was home to make the 1037 and 1039 phone calls, why the state had selected that route. He asked, in essence, and this is at volume 27 of the record at page 927 and 928, why the state had selected that route, given that it goes through the heart of downtown Rockford. The suggestion being that the heart of downtown Rockford is a congested area, there's many stoplights, and that petitioner, who was a lifelong resident of Rockford, would be less likely to take that route than the bypass route. Again, turning to the failure to introduce testimony from Mitchell Olson at the evidentiary hearing, excuse me, at trial, Mitchell Olson testified at the evidentiary hearing that he didn't recall ever getting any calls from Carol. That's not the same thing as to say, well, I'm certain that she never called me. He also testified that, and petitioner spells this out at page 10 of their opening brief, that Alan usually returned the calls. So that's not an unequivocal statement that Mrs. Beeman would never return the phone calls. Turning to other claims raised in this case, petitioner's first claim was that Detective, Detective Friesenmeier testified, gave false or highly misleading testimony, and that the prosecutor was under an obligation to correct that testimony. However, that petitioner is not entitled to relief on that claim, because that claim is forfeited. As the appellate court held below, the failure to raise the claim on direct appeal results in a forfeiture. And petitioner's reply brief, petitioner suggests a number of additional grounds that aren't raised in the opening brief as to why the forfeiture should be excused. First and foremost, petitioner cites this Court's recent decision in Peeble v. Whitfield, stating that the interests of justice require the relaxation of the forfeiture rule. People note that Whitfield is a case on direct appeal, and at page 6 of the slip opinion in that case, this Court notes that absent plain error, the forfeiture rule can be relaxed to maintain a uniform body of precedent or where the interests of justice so require. But as this Court has held in Peeble v. Free and Peeble v. Owens from 1988 and 1987, there's no plain error review on post-conviction appeal. Additionally, in the appellate court below, petitioner had argued that the forfeiture rule should be relaxed because of a fundamental fairness, citing this Court's decision in Peeble v. Olinger, which was also a case involving a NAPU claim. But that case is distinguishable because the evidence tending to show that the witness's testimony was false in that case was not a part of the record on direct appeal. But even if this Court examines the merits of the NAPU claim, in order to determine whether direct appeal counsel is ineffective, this Court should find that the NAPU claim is meritless. On direct, on his direct testimony, the prosecutor questioned Detective Friesmeier regarding one time trial he had made from the Bell Federal Bank to petitioner's residence, excuse me, to the Bell Federal Bank from petitioner's residence. Detective Friesmeier testified that the route, that he traveled the route at the speed limit and that the route he took went through downtown Rockford. And based on those two qualifying components of his testimony, it was clear that Detective Friesmeier was not purporting to give a categorical statement that it was impossible under any circumstances for the petitioner to make it home in time to make the phone calls. I think the petitioner has essentially conceded that point at page four of the reply brief where the petitioner acknowledges that Detective Friesmeier's testimony pertains only to one route. But didn't it leave that jury, didn't they believe that, could have believed that was how long it took? As opposed to Friesmeier knowing that he had already went a different route and it took 25 minutes in the grand jury report? I mean, doesn't that leave an inference? Yes. I think the evidence was presented in order to suggest to the jury that petitioner wouldn't have time to make the phone calls. But again, the way that the State went about making that point was purposefully and perfectly proper under due process norms because Detective Friesmeier never denied, whether expressly or impliedly, that he had timed the bypass route as well. As this Court has noted in People v. Pecoraro, the State is not under an obligation to introduce favorable testimony for the defense or to undercut the prosecution's own testimony. It is only if the witness testifies falsely on the subject that triggers the State's obligation to introduce or to correct the false testimony. But you concede that it was favorable testimony for the defendant? I think it was favorable to the State. But in this case, and I think this goes to the prejudice issue. But what was kept out, 25 minutes? That was not introduced. I understand that. But wasn't that favorable to the defendant? Yes, that was favorable to the defense. But defense counsel, again, in his primary trial strategy, decided that I'm going to focus on the odometer evidence. But also I'm not going to neglect the fact that this other route exists. And during the course of the trial, defense counsel elicited from Petitioner and from other witnesses that this bypass route existed and that it was high speed. For example, during Petitioner's testimony on direct, he stated that he took the bypass route and not the downtown route. And also on his direct, he indicated that the downtown route was longer and that I can save up to 10 minutes if I take the bypass route. So the jury certainly had information to find that they had a basis for finding that Petitioner took the bypass route home and was in a position to make the phone calls. And I'd like to turn to prejudice for a minute. The prosecutor's theory of trial was that the murder occurred shortly after noon. But in response to a request from defense counsel during discovery proceedings, the prosecutor filed a bill of indictment stating that the murder occurred between 12 and 2 p.m. And that's important because, in this case, a rational fact finder could have found that Petitioner made the phone calls and was still able to commit the murder in normal. In that case, Petitioner would leave his Rockford residence at approximately 1040 a.m. and making the trip to normal in about approximately two hours and returning back to Rockford in two hours. And the jury would have been allowed to make that finding because during the closing argument of the prosecutor, he stressed that it was unclear when Carol Beeman had returned home from her shopping trip. He stressed that during her initial comments with police, that she had returned home at approximately 3 p.m. During subsequent investigations, the time was narrowed down to 2.30 p.m. and then finally to approximately 2.13 or 2.15 p.m. So if the jury was in a position to find that Carol Beeman either had been incorrect or had lied regarding when she had returned home from her shopping trip. And again, the prosecutor, while stating that Carol Beeman wasn't a person who would lie intentionally, might give her son the benefit of the doubt on this kind of question. Petitioner's third claim in this case is a Brady claim. Petitioner claims that the prosecution withheld favorable material evidence regarding John Doe, whom Petitioner contends was a viable suspect in the murder. Petitioner cannot obtain relief on this claim because none of the undisclosed John Doe evidence was favorable to the defense. With respect to John Doe, doesn't he have the very same motives to have killed the victim that you described about the defendant? No, Your Honor, I don't believe that's correct. His desire to date the victim again, his encounter with her new boyfriend, all of these things I think you said motivated the defendant to kill her, but at the same time you said they didn't likewise motivate Doe. Aren't those same motives present for Doe as well as for this defendant? Those motives have been asserted as motives Doe could have had, but I think it's important to note that in those interviews with police, and this is at Volume 8 of the record, I don't have the exact page, but he denied that he was interested in resuming a relationship with Jennifer Locke Miller. But at some point the defense wanted to question Doe, and I think the state made a motion to bar the testimony of Doe because he was not assured the court that he was not a suspect, and the court granted that motion. At which point did the state change its view of Doe and feel that he was a viable suspect, before that motion was made or after that motion was made, and is there anything in the record to show the time frame? Your Honor, the state's position is that Doe is not a viable suspect in this case, although a police detective But at what point he was? According to police, but not according to the prosecutor. The prosecutor's position was that Doe had nothing to do with the case, because his last sexual contact The police investigated this? Yes. The state relies upon the investigation of the police? Yes. During the post-conviction evidentiary hearing, the original trial prosecutor, there was no testimony showing what or when he knew about Lieutenant Daniel's designation of Doe as a suspect, though it's possible he could have known. But to go back to Your Honor's point about the motion in limine, the state filed a motion in limine, I believe it was in the middle of February, which is approximately one month before trial, asking the trial court to preclude alternative suspect evidence in the absence of a showing by a defense counsel that the evidence closely connected the third party with the commission of the crime. This is all circumstantial evidence as far as the defendant is concerned? That's correct, but it's What was the difference in the circumstantial evidence that could have been applied to Doe as was applied to the defendant? Certainly, Your Honor. Petitioner's Brady claim just focuses on three or four pieces of evidence regarding John Doe that was not disclosed, and it's the people's position that that evidence does not closely connect Doe with this murder in any way. The undisclosed evidence was that Doe used steroids and that caused him to behave erratically, but there's no indication that Doe used steroids in the presence of Jennifer Lockmiller or on the date of the offense. Did this defendant use steroids? I don't understand how that's a difference. Well, the difference is that the steroids, in the people's position, in the people's view don't tie Doe to the murder in any way, so therefore it cannot be favorable evidence and there can be no Counsel, when you say the people, you're referring to the prosecutor who was trying the case. That was his judgment, his or her judgment. Is that correct? I'm sorry, I don't It was the prosecutor who was trying the case that had concluded that Doe was not a viable suspect. Is that right? At the post-conviction evidentiary hearing, Your Honor, the original trial prosecutor testified that Alan Beeman was his primary suspect and remained so throughout the course of proceedings. So the argument is that the fact that this person didn't believe that Doe was a viable suspect was sufficient not to reveal the name to the defense. No, I don't think that's correct. Why the evidence was not disclosed to the defense is not reflected in the record, but in this case the Well, the state made a motion to preclude, right? That's right, but defense counsel conceded with possession, when he had possession of Doe's transcripts of interviews with police in which Doe stated that he didn't have an alibi for part of the relevant time frame, although he had an alibi after 1 o'clock. He indicated that he had a prior sexual relationship with Jennifer Locke Miller and similar types of evidence establishing a relationship between them. But defense counsel conceded that that was not enough to introduce evidence that Doe was or, excuse me, that evidence should be admitted tending to show that Doe was the killer. Well, what about when you look at what you knew about Doe in the context of how this case was being presented by the state? The state viewed at least Doe as a suspect at one time, right? And that he had an assault charge against him of some sort and that he had no alibi, in fact, lied about having an alibi. So when you look at it in the context of a case that the state seems to be presenting almost exclusively on motive and opportunity of the defendant to commit the crime, when you look at it in that context, you don't think it would be important for the defense to know about Doe? No, Your Honor. This is not material evidence. Just to go back to your Honor noted that Doe had lied about his alibi, but in this case the circuit court, after holding an evidentiary hearing on this claim, found that it was equally plausible inference that Doe had not lied intentionally and that he, in fact, corrected himself at the second interview. With respect to the battery charge, it's important to note that the domestic battery was with a woman other than Jennifer Lockmiller, and that tends to show that that doesn't connect Doe with this crime. Doesn't it tend to show he's violent? It could be violent. That's true, Your Honor, but the important, in this case, what the petitioner needed to show to introduce evidence of an alternative suspect, petitioner had to establish, may I finish my answer? Yes. The petitioner needed to show that to establish a close connection between Doe and the commission of this murder, and a battery with an unrelated victim doesn't meet that test.  Thank you, Your Honor. Rebuttal, Ms. Daniel. Well, Your Honor, the state's now conceded that the Friesmeier 25-minute drive time was favorable to the defense. The defense counsel had it. He didn't present it. By definition, I think that's ineffective assistance of counsel. But the defense was in possession of that information, weren't they? Yes, he was. Did he testify to that before the grand jury? Yes, he was. He had the transcript of that. So it's more than just the defense wasn't notified of it. You're saying it's – No, I'm saying it was ineffective assistance of counsel because he didn't use it. It goes to the ineffectiveness argument. He had it. He didn't use it. As for Vern Pickett's testimony that comparisons of drive times aren't that reliable, that's the kind of thing you say when you don't have good evidence to present. All the defense had to show was that it was possible to drive from the bank to the Beeman home within the time frame. Not that every time anyone ever drove that route that they got there within that time frame, but that it was possible. That's all they had to show. And clearly, it would have been much more persuasive to do that with a timed trial by the detective in the case and the defense investigator than just to ask Alan Beeman, well, about how long do you think it takes you? Counsel, a quick question. Was the evidence relative to the mother and where she was in the morning and where she stopped and the trip to the department store, et cetera, was that available at the time of trial or was that something that was found in preparation for the PC? Or was any part of it found in preparation for the PC? The evidence that was elicited during the PC proceedings that, well, it was available at the time of trial, it just didn't come out at trial, two things. One were the timed trials that we did, which were more realistic than what Detective Friesmeier did. He just drove curb to curb in front of the Beeman house, in front of the Walmart. We actually had our investigators start either inside the Beeman home or in the driveway, get in the car, drive to the Walmart and park. And that ended up closer to 20 minutes than Friesmeier's 15 minutes. And the other part of that that was developed during the post-conviction proceedings was what she did in the store, where she went to buy these items, how she shopped, how she looked for Alan Beeman's jeans that she was buying. So some was developed after the trial in preparation for the PC. Well, exactly. Some was available, at least. It was all available. All he had to do was ask the questions. When I say available, I mean you already had the information. Not that you developed the information. Well, the information was with Carol Beeman. Defense account, it was available to him. But he didn't use it. So this is an ineffective assistance argument as well. Exactly, Your Honor. Now, going to the John Doe evidence. Actually, before I leave that, I just want to point out, Your Honor, that Prosecutor Suk at the post-conviction hearing testified that, in response to a question that we asked him, in order for the jury to find Alan Beeman guilty of this murder, the jury had to find that Carol Beeman made the phone calls and Alan Beeman did not make the phone calls. So that was a dispositive issue in this case, according to the prosecutor. Was there, at the time of trial, testimony from Carol Beeman that she did not make the phone calls and that she did not go home after she dropped her mother off and before she did the Walmart shopping? She did say that, Your Honor. She gave that testimony. You're asked on this instance to say that counsel was ineffective. He had direct testimony to the fact that she did not make the phone calls. You're saying that he should have followed up by buttressing her testimony based upon a timeline as well as what she did in the store? Right. He should have and could have developed that theory to show that it was even more illogical than the jury thought it was, and also that she literally did not have time to leave her house and get back and go through the Walmart shopping in the time that was available to her. And that was evidence that he did not bring forward. Quickly going to the John Doe evidence, it's just ironic that the State now says, well, this evidence about John Doe, it doesn't make him a suspect. He was questioned as a suspect by the police. He was polygraphed as a suspect. As I mentioned, Lieutenant Daniels still thinks he's a suspect. He gave inconsistent statements regarding his whereabouts at the time of the crime. And this is in a case where half of the prosecutor's closing argument was talking about how Allen made little inconsistent statements here or there and that that was evidence of consciousness of guilt. Well, how about John Doe, who first says, I was out of town at the time of the crime, and then later after the police talked to his girlfriend, he has to come back and admit that, in fact, he was in town. He also made inconsistent statements about when he last saw the victim. In his first interview, he said he saw the victim within a day or two of her murder. She had stopped by his apartment with Michael Swain, her then boyfriend, in a car. But John Doe said in the first interview he went to her apartment after that, within a day or two of the murder. But at the second interview, he said, oh, no, I didn't do that. Or if I did, she wasn't home. I mean, those kind of inconsistencies, much smaller ones, were what the prosecutor used to prosecute this case against Allen Beeman. But somehow that's not significant with respect to John Doe. And in this case, you're claiming that that information about the violence, the steroid use, the polygraph, that wasn't made available to either the defense counsel or to the court in helping to make a decision on the motion in limine. That's correct. And it's very important that prosecutors sued when asked a direct question by the court, said, no, we don't have any evidence of any other suspects. Because that's part of the equation. It's not just the information that wasn't turned over. Although that's very critical, particularly the evidence of violence. Because that's a factor that was not present in Allen Beeman's background, physical violence against another person. There was no evidence of that. But this gentleman had been violent against him. It was a batterer. It was a repeat batterer of his girlfriend. And that was very critical. Also, prosecutors pooh-poohed the fact that John Doe had provided drugs to Jennifer Lockmiller and that she owed him some money. He thought that wasn't particularly significant. But the fact that he had been arrested for a large amount of drugs, that puts that in a whole different light.  to see Jennifer Lockmiller once he got back to town, which I believe was going to be at the beginning of September, so very shortly thereafter. They definitely had plans to see each other again. They had a prior sexual relationship, and they were going to see each other again. He was a suspect. That evidence would have been admissible, and it would have rebutted the primary focus of the prosecution in this case, which was these homilies from Hercule Poirot, which was that you identify all the possible suspects and you wipe them off the list. Well, John Doe wasn't wiped off the list. And that, completely aside from and independently of the ineffective assistance of counsel in this case, could have changed the verdict in this case, and that's an additional reason why Your Honors should reverse this conviction. Thank you. Thank you, Ms. Daniel, and thank you, Mr. Blankenheim. And then case number 104096, People of the State of Illinois v. Allen Beeman is taken under advisement as agenda number three.